**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | |
| MOHIT VOHRA, JASPRET | : | |
| KAUR, et al. | : | CRIMINAL NO. 09-546 |

**MEMORANDUM RE: POST-TRIAL MOTIONS**

**Baylson, J.**                                                    **May 4, 2012**

I.      **Introduction**

On May 27, 2010, a federal grand jury returned a Superseding Indictment against

Defendants Mohit Vohra ("Vohra") and Jaspret Kaur ("Kaur").  (ECF No. 62)  Count I of the

Superseding Indictment charged Vohra with conspiracy to distribute 5 kilograms or more of a

mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C.

§§ 841(a)(1), (B)(1)(A).  Count II charged Vohra with possession with intent to distribute 100

kilograms or more of a mixture and substance containing a detectable amount of marijuana, in

violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B).  Counts III through XV charged both Vohra and

Kaur with one Count of conspiracy to commit money laundering, in violation of 18 U.S.C.

§ 1956(h), and twelve Counts of the substantive offense of money laundering, in violation of 18

U.S.C. § 1956(a)(1)(B)(I).

On January 10-11, 2011, a jury trial was held before the Honorable John P. Fullam on all

Counts of the Superseding Indictment.  On the second day of the trial, the court ordered a mistrial

1

on the grounds that Counts III-XV, the money laundering counts, should be severed and tried separately from Counts I and II.  (ECF No. 111)  On March 1, 2011, Vohra pleaded guilty to Counts I and II.  (ECF No. 116)

On April 18, 2011, the case was reassigned to this Court.  (ECF No. 125)  Counts III-XV of the Superseding Indictment were tried before a jury on August 15-16, 2011; Vohra and Kaur were convicted on all Counts.  During trial, immediately following the government's presentation of its case, counsel for each Defendant moved for a judgment of acquittal under Fed. R. Civ. P. 29.  (Tr. II, 75-82)  The Court reserved judgment on the Motions.  (Tr. II, 80)  After the trial concluded, Vohra and Kaur renewed their Motions for Judgment of Acquittal in writing, and Kaur also filed a Motion for a New Trial under Fed. R. Civ. P. 33.  (ECF Nos. 157-59)  Briefing on the post-trial motions was completed on February 22, 2012.

On March 7, 2012, the Court held oral argument.  At the Court's invitation, the government submitted a supplemental brief prior to argument that provided a chronology of the events and related evidence that allegedly comprised Defendants' money laundering offenses. (ECF No. 174)  After carefully considering the written submissions and oral arguments of the parties, the Court issued an Order on March 12, 2012 denying all of Defendants' post-trial motions.  (ECF No. 183)  The Court indicated in its Order that a Memorandum explaining its ruling would issue in due course.  Accordingly, the reasons for that Order are explained below.

II.    **Factual Background**

A.    **Vohra's Transportation and Delivery of Drugs**

On March 21, 2009, Vohra was stopped by the Missouri Highway Patrol while driving an 18-wheel truck from California to Pennsylvania to deliver a load of refrigerated pasta.  (Tr. I, 44-

45)  It was discovered during the stop that he was carrying a large quantity of cocaine.  The Highway Patrol contacted the Drug Enforcement Agency (DEA), who sent DEA Agent George Krieg to meet with Vohra.  When Agent Krieg arrived, Vohra agreed to cooperate with the DEA by making a controlled delivery of the cocaine in his vehicle.  (Tr. I, 45)  Vohra identified a man named "Raj" as the man who was organizing the distribution of the cocaine.  (Tr. I, 46-47)

On March 22 and 23, 2009, Agent Krieg and other law enforcement accompanied Vohra as he continued his drive to Philadelphia to complete the controlled delivery.  (Tr. I, 54-55) During the drive, Vohra spoke to Raj over the phone to explain his delay in reaching Philadelphia, which call was recorded by law enforcement.  Vohra and Raj spoke in Punjabi, their native language.  (Tr. I, 49)  When asked to relay the contents of his conversation to Agent Krieg, Vohra omitted one portion of the conversation in which it appears that the two men were referencing prior drug deals.[1]  When the calls were later transcribed through the use of an interpreter, the government learned the full content of the calls.  (Tr. I, 70, 83)

When Vohra arrived in Philadelphia on March 23, 2009, DEA Task Force Officer Peter Sarris assumed control of the investigation.  A series of recorded phone calls were made between Vohra and Raj to arrange the delivery of the cocaine, and Vohra eventually delivered the cocaine to a man named Francisco Salgado-Matos.  (Tr. I, 155-57)  Salgado-Matos was arrested after he received a suitcase of cocaine from Vohra and put it in his car.  (Tr. I, 157)

---

[1] The Court ruled, with the government's consent, that this phone call was admissible at trial only against Vohra, and not against Kaur, because there was no evidence that she was involved in the drug conspiracy.  Audio File 8/12/11 at 2:17-2:27 (ECF No. 139); Audio File 8/15/11 at 00:30-3:00 (ECF No. 143).

After Salgado-Matos' arrest, Officer Sarris and Vohra discussed the need for someone in Vohra's trucking company to take possession of the refrigerated pasta remaining in the trailer. At that time, Vohra confessed there were more bags of drugs hidden in the trailer.  (Tr. I, 159) Vohra consented to a search, during which trash bags containing over 1300 pounds of marijuana were discovered and seized from the trailer.  (Tr. I, 159-62)  At trial, Officer Sarris testified that the cocaine transported by Vohra was worth more than an estimated $2 million and the marijuana was worth more than an estimated $1 million.  (Tr. I, 162)

**B.**      **Vohra's Accounts at Bank of America**

Vohra had four accounts at Bank of America (BOA) prior to his arrest. The accounts included a standard checking account, a business checking account, a savings account, and a certificate of deposit.  Between February 28, 2008 and January 8, 2009, a total of $27,600 cash was deposited into the standard checking account in seven installments of exactly two, three, four, or five thousand dollars and one installment of $2,600.  (Tr. II, 44)  Between February 14, 2008 and January 15, 2009, a total of $25,000 cash was deposited into the business checking account in seven installments of exactly two, six, or nine thousand dollars.  (Tr. II, 40-41)  All together, the cash deposits into Vohra's standard checking and business checking accounts during this period amounted to $52,600.

**C.**      **The Phone Calls Between Vohra and Kaur and the Contemporaneous Money Transfers**

On March 20, 2009, during Vohra's trip from California to Pennsylvania but before he had been stopped by law enforcement, a call was placed from Vohra's phone to Kaur's phone. The call lasted 637 seconds.  Audio File 3/15/11 at 2:42-2:43 (ECF No. 144).

4

There were no phone calls between Vohra's and Kaur's phones on March 21, 22, and 23, 2009. However, on March 24, 2009, after Vohra had been arrested and incarcerated in the Federal Detention Center, Kaur's phone called Vohra's phone eight times. All of the calls lasted less than 25 seconds. Similarly, on March 25, 2009, Kaur's phone called Vohra's phone three times, for less than 27 seconds per call. Audio File 3/15/11 at 2:42-2:43 (ECF No. 144).

Beginning on March 26, 2009 and extending through March 31, 2009, Vohra used a phone at the Federal Detention Center to call Kaur's phone ten times. Audio File 3/15/11 at 2:37-2:40 (ECF No. 107). Vohra and Kaur also spoke multiple times in August 2009, and transcripts of those phone calls were introduced as evidence. Most notably, in a call that took place on August 16, 2009, Vohra directed Kaur as follows: "Do this, empty my bank." (Tr. I, 191)

D.    **The Money Transfers**

On March 25, 2009—after Vohra had been arrested, but before he and Kaur were able to connect on the phone, as detailed above—two checks totaling $86,500 were drawn from Vohra's business checking account and made payable to Jaspret Kaur. The first check was for $26,500 and the words "Pay Back Loan" were handwritten in the memo section. (Tr. II, 19-23) The second check was for $60,000 and the words "Loan Pay Back" were handwritten in the memo section. (Tr. II, 19-23) The business checking account contained approximately $90,000 at that time, so the withdrawals would have nearly emptied the account. (Tr. II, 24)

The DEA financial analyst who testified at trial testified that a loan payback is not ordinarily treated as income to the recipient for tax purposes. (Tr. II, 20) The analyst also testified that his investigation had not uncovered any evidence of an actual loan between Vohra

and Kaur before March 25, 2009; indeed, he found no evidence that any money had been moved between their accounts in the previous two years (Tr. II, 23, 49)

Ultimately, Bank of America reviewed the two checks but determined that the signatures on the checks did not, in fact, match Mohit Vohra's signature.  (Tr. II, 28)  Accordingly, the bank declined to transfer the money out of Vohra's account.

On March 30, 2009, Officer Sarris met with Kaur to return Vohra's personal property to her.  At the meeting, Officer Sarris told Kaur that Vohra had been arrested with "a lot of cocaine in his car." (Tr. I, 165)  That same day, and only a few days after Vohra began calling Kaur from the Federal Detention Center, Kaur began a series of online transfers of money from Vohra's personal checking account at BOA into her personal checking account at BOA.  Stipulated evidence provided that the IP address associated with Kaur's computer was the IP address used to make the transfers, and Kaur does not dispute that she, in fact, made the transfers.  (Tr. II, 77)

The transfers occurred on the following dates and in the following amounts (Tr. II, 31-34, 46-49):

| | |
|---|---|
| March 30, 2009 | $1,000 |
| March 31, 2009 | $4,700 |
| April 2, 2009 | $2,500 |
| April 9, 2009 | $5,000 |
| April 13, 2009 | $4,800 |
| April 14, 2009 | $4,800 |
| April 15, 2009 | $4,800 |
| April 20, 2009 | $4,800 |
| April 21, 2009 | $4,900 |
| April 27, 2009 | $4,800 |
| May 4, 2009 | $4,800 |
| July 10, 2009 | $2,500 |

In total, Kaur transferred $52,400 from Vohra's account into her account.  (Tr. II, 49)

In September 2009, Kaur used $50,000 from her personal checking account to purchase land in Hazelton, Pennsylvania on behalf of Pennsylvania Properties Network, a corporation that she owned.  (Tr. II, 51)   At the time Kaur made the purchase, more than $35,000 of the $52,400 she had moved from Vohra's account remained in her account.  (Tr. II, 50)  Vohra's name does not appear on any documents associated with the land purchase.  (Tr. II, 51-51)

III.   **Summary of Vohra's and Kaur's Post-Trial Motions**

Vohra moves for a judgment of acquittal on the conspiracy and substantive money laundering charges for two reasons.  First, he argues that the government failed to prove beyond a reasonable doubt that the cash deposits made into his bank accounts constituted the proceeds of illegal activity.  Second, Vohra argues that there was insufficient evidence that he demonstrated the requisite knowledge and intent to commit money laundering because (1) the government did not prove that it was Vohra who originally made the deposits into his account, (2) the evidence showed that Vohra did not have access to his accounts while he was in custody and therefore could not have made the money transfers himself, and (3) there was no evidence of an agreement between him and Kaur regarding her movement of the funds.

Kaur moves for acquittal on the grounds that, absent evidence from the Raj-Vohra phone conversation—which the jury was permitted to consider only against Vohra, and not against Kaur—there was insufficient evidence to prove that the money she moved from Vohra's account contained illegal proceeds.

Kaur moves for a new trial on two grounds.  First, she argues that the Court erred in declining to sever her case, because she was unfairly prejudiced by admission of the Raj-Vohra

phone conversation.  Second, she argues that the government engaged in prosecutorial

misconduct during closing argument, as will be explained in more detail below.

IV.    <u>Legal Standard</u>

    A.    **Motion for Acquittal Under Fed. R. Crim. P. 29**

    In reviewing a jury verdict for sufficiency of the evidence, the Court "must consider the

evidence in the light most favorable to the government and affirm the judgment if there is

substantial evidence from which any rational trier of fact could find guilt beyond a reasonable

doubt."  <u>United States v. Gatlin</u>, 613 F.3d 374, 380 (3d Cir. 2010) (internal quotation marks

omitted).   "The burden on a defendant who raises a challenge to the sufficiency of the evidence

is extremely high,"  <u>United States v. Starnes</u>, 583 F.3d 196, 206 (3d Cir. 2009) (internal

quotation marks omitted), and a finding of insufficiency should be "confined to cases where the

prosecution's failure is clear," <u>United States v. Smith</u>, 294 F.3d 473, 477 (3d Cir. 2002).  The

Court may not "usurp the role of the jury by weighing credibility and assigning weight to the

evidence, or by substituting its judgment for that of the jury."  <u>United States v. Brodie</u>, 403 F.3d

123, 133 (3d Cir. 2005).  Finally, because Vohra and Kaur moved under Rule 29 at the close of

the government's case-in-chief and the Court reserved judgment on their motions (Tr. II, 75-81),

the Court must limit its inquiry to the evidence submitted to the jury at that point in the trial.

Fed. R. Crim. P. 29(b);  <u>United States v. Boria</u>, 592 F.3d 476, 480 n.7 (3d Cir. 2010).

    B.    **Motion for New Trial Under Fed. R. Crim. P. 33**

    Under Rule 33, "[u]pon the defendant's motion, the court may vacate any judgment and

grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Unlike a motion

under Rule 29, "when a district court evaluates a Rule 33 motion it does not view the evidence

favorably to the Government, but instead exercises its own judgment in assessing the

Government's case." United States v. Silveus, 542 F.3d 993, 1004 (3d Cir. 2008) (internal

quotation marks omitted).  However, even if the Court believes that the jury verdict is contrary to

the weight of the evidence, it may order a new trial "only if it believes that there is a serious

danger that a miscarriage of justice has occurred—that is, that an innocent person has been

convicted." United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002) (internal quotation marks

omitted).  Rule 33 motions are "granted sparingly and only in exceptional cases." Gov't of V.I.

v. Derricks, 810 F.2d 50, 55 (3d Cir. 1987).

**V.    Discussion**

    **A.    Vohra's Motion**

Vohra first claims that the government failed to prove beyond a reasonable doubt that the

cash deposits made into his bank accounts constituted the proceeds of illegal activity.  Vohra

emphasizes that the DEA financial analyst who testified at trial could not determine the source of

the cash deposits (Tr. II, 42), and any evidence that Vohra was involved in the drug trade prior to

the California-Pennsylvania truck transport was merely circumstantial.

Vohra's argument is without merit.  Circumstantial though it may be, the evidence at trial,

viewed in the light most favorable to the government, was more than sufficient to support the

jury's determination that Vohra's bank accounts contained illegal proceeds.  The evidence at trial

showed that a series of all-cash deposits, in round-number amounts, were deposited into Vohra's

accounts between February 2008 and January 2009.  (Tr. II, 40-41, 44)  These deposits contrasted

with a number of checks payable to Vohra or to his trucking company from other trucking

companies during the same period of time, which were also deposited into Vohra's accounts and

which the financial analyst interpreted as Vohra's ordinary business income.  (Tr. II, 40)  The

jury was therefore permitted to infer that the all-cash deposits were <u>not</u> part of Vohra's ordinary

business income.  The jury was also permitted to consider Kaur's transfer of $52,400 out of

Vohra's checking account after he was arrested—almost exactly the amount that had been

deposited in all-cash, round-number deposits over the course of the previous year ($52,600)—as

corroboration of the suspicious nature of the deposits.[2]

      The evidence at trial also showed that Vohra was caught transporting over $2 million in

cocaine and over $1 million in marijuana in March 2009.  (Tr. I, 162)  Officer Sarris testified that

people who transport drugs for suppliers, <u>i.e.</u>, drug mules, get paid for their assistance; the

amount of payment varies based on the amount of drugs transported and the distance involved.

(Tr. I, 150)  Officer Sarris testified that with a transaction of this nature, "[e]veryone's life was at

risk[.]"  (Tr. I, 209)

      As the government argued at trial, it would defy common sense for a drug supplier to

trust a truck driver to transport huge quantities of drugs all the way from California to

Pennsylvania—at great risk to the driver, the supplier, and everyone else involved—without first

having developed a relationship of trust with that driver, presumably through previous illegal

---

[2] Vohra's argument that the government failed to prove he personally made the deposits is
unavailing.  Whether he personally made the deposits is irrelevant, so long as Vohra knew the
deposits contained illegal proceeds.  <u>See</u> <u>United States v. Morelli,</u> 169 F.3d 798 (3d Cir. 1999)
(stating that money laundering requires "knowledge that the transaction involves the proceeds of
some unlawful activity").  But Vohra's argument is especially dubious in light of the fact that the
deposits were made into his business and checking accounts in a series of installments over the
course of a full year.  The jury was certainly not required to believe in a fairytale in which
"magical" cash deposits appeared in Vohra's bank accounts throughout the course of a year,
which Vohra did not disclose to the bank or any authorities.

activities.  Although Vohra was not charged with laundering illegal proceeds from the California-Pennsylvania trip, the trip is powerful circumstantial evidence that Vohra was previously involved in the drug trade.  See, e.g., United States v. Massac, 867 F.2d 174, 178 (3d Cir. 1989) (holding that the defendant's use of a wire service to transfer $22,000 in cash to Haiti over a five-month period, combined with evidence of engagement in drug trafficking, was sufficient to convict for money laundering).

Similarly, the evidence at trial showed that after Salgado-Matos picked up the cocaine at the "drop point" and was arrested, Vohra confessed to law enforcement that there were more bags (of marijuana) in the trailer.  (Tr. I, 159)  Because Raj had not arranged for Salgado-Matos to pick up the marijuana, the jury could infer that neither Raj nor Salgado-Matos knew about the marijuana; accordingly, the jury could reasonably conclude that Vohra was transporting the marijuana as part of a completely separate, large-scale drug conspiracy.  This, too, belies the notion that Vohra was brand new to the drug trade.

Finally, a number of phone calls introduced at trial, viewed in the light most favorable to the government, substantiate a finding that Vohra's accounts contained illegal proceeds.  Most salient for purposes of Vohra's Motion is the call between Raj and Vohra when Vohra was traveling to Philadelphia with law enforcement.  In that call, the men said the following (Tr. I, 70):

| | |
|---|---|
| Raj: | Okay.  How many were [unintelligible] last time . . . two or three? |
| Vohra: | Two. |
| Raj: | Those were two, right? |
| Vohra: | Hmm. |
| Raj: | Now are these three? |
| Vohra: | Hmm. |
| Raj: | Are these smaller or bigger than those? |

11

|        |                         |
|--------|-------------------------|
| Vohra: | Bigger.                 |
| Raj:   | Bigger, okay.[3]        |

Agent Krieg testified that when Vohra was asked to relay the contents of what had been said, Vohra never told him about this part of the conversation.  (Tr. I, 70, 83)  It was not until later, when the government obtained transcripts of the conversation from a Punjabi interpreter, that the government learned of these statements.  The jury was permitted to infer that this portion of the Raj conversation referred to a prior drug transaction that Vohra did not want the government to know about.  Accordingly, in light of this evidence and all of the other evidence presented at trial, the government adequately proved that Vohra's bank account contained illegal proceeds.[4]

Vohra next argues that there was insufficient evidence that he demonstrated the requisite knowledge and intent to launder money or to conspire to launder money.  Among other things, Vohra emphasizes that Kaur's attempts to move money via "loan payback" checks on March 25, 2009—when Vohra was undisputedly incarcerated and had not yet been able to communicate

---

[3] As previously noted, the Court ruled that this conversation was admissible only with respect to Vohra, and was not to be considered by the jury as evidence against Kaur.

[4] Because Vohra moved under Rule 29 at the close of the government's case-in-chief and the Court reserved judgment on his motion, the Court must limit its inquiry to the evidence submitted to the jury at that point for purposes of ruling on the Motion.  Fed. R. Crim. P. 29(b).  However, the Court notes that the jury, in reaching its guilty verdict, was permitted to consider as evidence of illegal proceeds the fact that the amount of cash deposited into Vohra's bank accounts in 2008 exceeded the gross receipts he reported on his 2008 tax return.  See United States v. Westbrook, 119 F.3d 1176, 1191 (5th Cir. 1997) ("Evidence that a defendant's cash outflow in a financial transaction exceeds his legitimate income is sufficient to show the transaction involves the proceeds of specified unlawful activity, even if the defendant claims income from other sources.") (internal quotation marks omitted).  The gross receipts from Vohra's tax returns from 2005-2008 were introduced as part of the defense case and the defense specifically requested to send the first page of each of the tax returns back with the jury during deliberations.  The request was granted, over the government's objection.  Audio File 8/17/11 at 1:17-1:18 (ECF No. 148); Audio File 8/18/11 at 5:30-6:00, 13:00-14:00 (ECF No. 152).

with her—demonstrates that Kaur was acting alone in transferring the money, without Vohra's knowledge or intent.

As a threshold matter, the Court notes that neither the conspiracy charge nor the substantive money laundering charges require proof of Vohra's knowledge of the two "loan payback" checks, nor did the government rely on such knowledge in making its case.  Rather, only the electronic money transfers beginning on March 30, 2009 and continuing through July 10, 2009 are charged in the Superseding Indictment as overt acts in furtherance of a conspiracy[5] and as substantive counts of money laundering.  (ECF No. 62)  Accordingly, the undisputed fact that Vohra did not have actual knowledge of the "loan payback" checks with which Kaur initially attempted to drain his business account in no way precludes a finding that he conspired with her to launder his illegal proceeds through electronic money transfers.

Moreover, the government provided ample circumstantial evidence that Vohra had the requisite level of knowledge and intent to commit these offenses.  The evidence at trial demonstrated that Vohra and Kaur had a close personal relationship and had spoken for 637 seconds (i.e., more than ten minutes) while Vohra was en-route to Pennsylvania with the drugs, before he was apprehended by law enforcement.  Audio File 3/15/11 at 2:42-2:43 (ECF No. 144). The evidence also showed that Vohra had provided Kaur with the information needed to access his accounts online, and, significantly, had placed a number of phone calls to Kaur from the Federal Detention Center contemporaneous with the dates of the suspect money transfers.

---

[5] As the Court will discuss below, though the Superseding Indictment charged a number of overt acts in furtherance of the conspiracy, an overt act is not a required element of the offense of conspiracy to commit money laundering under 18 U.S.C. § 1956(h).  Whitfield v. United States, 543 U.S. 209 (2005).

Compare Audio File 3/15/11 at 2:37-2:40 (ECF No. 107) (describing phone calls between Vohra and Kaur while he was incarcerated) with Tr. II, 31-34, 46-49 (describing the dates and amounts of the money transfers).

The government also introduced evidence in the form of transcripts of telephone conversations between Vohra and Kaur in August 2009.  Although these calls took place after the money transfers were completed, their contents shed light on the relationship between the two co-conspirators.  In the phone calls, Vohra and Kaur speak in unusually vague terms, yet appear to understand exactly what the other person is saying.  Moreover, on multiple occasions Vohra and Kaur appear to check themselves from speaking openly about incriminating topics that they do not want recorded by the Federal Detention Center.  For example, in a phone call on August 6, 2009, after Vohra makes a series of vague references to an unidentified "them" that he "found out about," he says to Kaur: "I cannot tell you on the phone, right?"  And Kaur responds: "Yes, that's fine.  It's nothing like that."  (Tr. I, 177-78)

In another phone call on August 15, 2009, Vohra states, in a vague context: "It will take some time.  More or less, it will take two years, but nothing will happen."  Kaur then responded by saying: "Okay, fine then.  You just stay quietly."  (Tr. I, 189)  The jury was permitted to infer from these conversations that Vohra and Kaur were able to conspire together without having to communicate about the conspiracy explicitly; they were also permitted to infer that the statements about "I cannot tell you on the phone" and "just stay quietly" evidenced consciousness of guilt.

Finally, on August 16, 2009, the following conversation took place between Vohra and Kaur (Tr. I, 191-92):

14

| Vohra: | Fine. Fine.  Okay.  Do this, empty my bank. |
| Kaur: | Okay. |
| Vohra: | Hmm? |
| Kaur: | Okay.  I will do it.  If tomorrow they—they ask for money—if Perry [defense counsel] does— |
| Vohra: | They will block it now. |
| Kaur: | Okay.  You be quiet.  No need to say anything, right? |
| Vohra: | Mmm-hmm. |

The jury was permitted to consider this phone call as direct evidence of a money laundering conspiracy between Vohra and Kaur.  Indeed, an overt act is not required to prove conspiracy to commit money laundering under 18 U.S.C. § 1956(h).  See Whitfield v. United States, 543 U.S. 209 (2005).  In effect, as soon as Vohra told Kaur to "empty [his] bank" with the understanding that she would be laundering his drug proceeds, and Kaur agreed, the crime of conspiracy was completed.  The fact that Kaur did not actually empty his bank after the conversation took place is irrelevant, or at least not a requisite component of the government's case.

Vohra understandably but unpersuasively argues that the fact that he directed Kaur to "empty [his] bank" on August 16, 2009—after Kaur had completed the money transfers—demonstrates that he had no knowledge of those transfers.  In other words, Vohra contends that even if the evidence is sufficient to prove conspiracy based on the August 16, 2009 conversation, the evidence is not sufficient to support the counts of substantive money laundering against him because Kaur made those transactions before August 16, 2009.

The jury, however, was not required to construe the phone conversation merely as evidence of a conspiracy initiated on August 16, 2009.  That is only one possible inference, viewing the evidence in a light favorable to Vohra.  If the conversation is considered, instead, in the light most favorable to the government, the conversation represents a final instruction to Kaur

to empty the <u>remaining</u> money left in Vohra's accounts, perhaps out of concern that the government was about to freeze his assets, <u>i.e.</u> "block it."  Viewed this way, the conversation is circumstantial evidence of an ongoing money laundering conspiracy that had commenced in the past.  Indeed, nothing in the conversation suggests that Kaur found the "empty my bank" instruction surprising, out of the ordinary, or unclear with respect to where and how she should move the money, nor did Vohra feel the need to explain where and how she should move it.  Thus, the jury was permitted to deduce that Kaur had previously moved money for Vohra.  For these reasons, Vohra's Motion for Judgment of Acquittal is without merit.

**B.    Kaur's Motions**

Kaur also moves for acquittal on the basis that the evidence was insufficient to show the money moved from Vohra's accounts constituted illegal proceeds.  Her central claim is that without evidence of the contents of the phone conversation between Raj and Vohra, in which the men discussed the "two" from "last time" and the "three" from this time—a conversation that was not admissible against her—there is no independent evidence in the case that the money in the accounts actually contained illegal proceeds.  This is simply untrue.  The Court detailed above various other pieces of evidence from which the jury was permitted to conclude that the accounts contained illegal proceeds, including the structure of the all-cash deposits and Vohra's participation in a large-scale and dangerous drug transport scheme, which tended to prove that he had been involved with drugs in the past.  What is more, the fact that Vohra expressed concern to Kaur on August 16, 2009 that the government would "block" his accounts—a conversation that <u>was</u> admissible against Kaur—helps confirm that the accounts contained illegal proceeds.  Kaur's motion for acquittal on these grounds is unavailing.

16

The Court turns now to Kaur's motion for a new trial.  Kaur first claims that the Court erred in declining to sever her case under Rule 14, because admission of the Raj-Vohra phone conversation was so prejudicial as to prevent her from receiving a fair trial.  The Court disagrees. The Court carefully instructed the jury repeatedly throughout the trial, as well as during the final jury charge, that it was not to consider the evidence of the Raj-Vohra conversation as evidence against Kaur.  As the Supreme Court has explained, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 56 U.S. 534, 537 (1993).  This is especially so in conspiracy trials were "joint trials . . . [can] aid the finder of fact in determining the full extent of the conspiracy."  United States v. Voigt, 89 F.3d 1050, 1094 (3d Cir. 1996) (internal quotation marks omitted).  In the Court's view, the evidence in this case was not so complex as to prevent the jury from appropriately compartmentalizing the evidence against each defendant, and the Court took great pains to instruct the jurors regarding the limited admissibility of the phone call.  Jurors are presumed to follow the Court's instructions.  CSX Transp., Inc. v. Hensley, 556 U.S. 838, 843 (2009).  Accordingly, the Court sees no reason to grant Kaur a new trial.  See United States v. DiPasquale, 740 F.2d 1282, 1294 (3d Cir. 1984) (affirming the district court's denial of a severance motion in light of, inter alia, "the trial court's repeated instructions to the jury to consider the evidence against each defendant").

Kaur also seeks a new trial based on what she alleges was prosecutorial misconduct during closing arguments.  Specifically, Kaur contends that it was improper for the government to imply during closing arguments that, in Kaur's words, she "had no knowledge that the defendant Vohra had been arrested yet because of his unknown whereabouts, [but] immediately moved funds out of his California bank account . . . [because] she must have been aware that he

17

was involved in some illicit activity and may have been apprehended by law enforcement."
Kaur's Br. at 9 (ECF No. 166).  Kaur argues that this was improper because the government was
aware, from proffers, that Kaur had already been contacted by Vohra's mother that he was in
custody and needed an attorney.  Id.

The portion of closing argument to which Kaur appears to be referring is as follows (Tr.
II, 140):

> Eleven times she calls Mr. Vohra's phone and never gets through.  And
> [eleven] times she calls and tries to get through.  What's reasonable?
> Maybe she's concerned about his health, his well-being, his safety.  Why?
> Why?  Why does she need to be concerned about moving money, $86,500
> out of his account?  Why is that a consideration?  Why does she need to be
> concerned, if she can't get in touch with Mr. Vohra, about getting all of his
> money out of his account?  Why is that important?  In our life experience
> if we're concerned about a friend or a family member and we can't get in
> touch with them, is it on the first hundred list of important things, I need to
> go into their bank account?  I need to move all of this money around.  I
> need to go in and take out every single piece of money that I can?  Is that
> reasonable?  Does that make any sense?  Of course it doesn't.  Unless you
> knew that Mr. Vohra, who you had not been able to get in touch with, may
> be in some trouble.  And he needed to get that money out of his account
> before someone else did.  And who would that someone else be?  The
> Government.

As an initial matter, depending on the timeline of events inferred from these closing
statements, the statements are not necessarily inconsistent with the account of events that Kaur
says she provided in her proffer.  Second, the government's closing was consistent with the
evidence in the record, and Kaur's argument depends on facts outside of the record that the
government would not have been permitted to reference.  Finally, these statements did not cause
unfair prejudice to Kaur, much less a "miscarriage of justice" as required under Rule 33, because
the notion that Kaur transferred illegal proceeds out of Vohra's account after she knew he had

been arrested is <u>at least</u> as incriminating (if not more so) as the government's suggestion that she transferred illegal proceeds after inferring that he might have been arrested or might have gotten into some other sort of trouble.  <u>United States v. Johnson</u>, 302 F.3d 139, 150 (3d Cir. 2002). Accordingly, the Court is unpersuaded by Kaur's Motion for a New Trial.

**VI.**   **Conclusion**

For the foregoing reasons, and after careful consideration of the parties' briefs and the oral arguments on March 7, 2012, the Court denied Vohra and Kaur's post-trial motions in its Order of March 12, 2012.  (ECF No. 183)

**BY THE COURT:**

**/s/ Michael M. Baylson**

_____

**Michael M. Baylson, U.S.D.J.**

O:\Criminal Cases\09-546 Vohra Kaur, US v\Kaur Vohra - Memo re Post Trial Motions.wpd

19